UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

WAYNE E. SARGENT,

                Plaintiff,

v.                                                            Case No. 5:08-cv-321-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                Defendant.
_____/

## ORDER

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying his applications for a period of disability, disability insurance benefits, and supplemental security income. (Doc. 1.) The Commissioner has answered (Doc. 11), and both parties have filed briefs outlining their respective positions. (Docs. 16 & 17.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

On November 1, 2004, Plaintiff filed applications for a period of disability, disability insurance benefits, and supplemental security income, alleging a disability onset date of May 2, 2002. (R. 68-71.) Plaintiff's application was denied initially and upon reconsideration. (R. 31-45, 47-48.) Thereafter, Plaintiff timely pursued his administrative remedies available before the Commissioner and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 49.) The ALJ conducted Plaintiff's administrative hearing on March 16, 2007. (R. 313-32.) The ALJ issued a decision

unfavorable to Plaintiff on April 18, 2007. (R. 18-27.) Plaintiff's request for review of the hearing decision by the Social Security Administration's Office of Hearings and Appeals was denied. (R. 5-7.) Plaintiff then appealed to this Court. (Doc. 1.)

## II. **STANDARD OF REVIEW**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla in that the evidence must do more than merely "create a suspicion of the existence of [a] fact," and must include "such relevant evidence as a reasonable person would accept as adequate to support the conclusion."[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient

---

[1] *See* 42 U.S.C. § 405(g).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Richardson v. Perales, 402 U.S. 389, 401(1971); Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); *accord* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding court must scrutinize entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding court must also consider evidence detracting from evidence on which Commissioner relied).

reasoning to determine that the Commissioner properly applied the law.[5] The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, he is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations, he is disabled.[11] Fourth, if a claimant's impairments do not

---

[5] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. See Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] Id. § 404.1520(c).

[11] Id. § 404.1520(d).

prevent him from doing past relevant work, he is not disabled.[12] Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are

---

[12] 20 C.F.R. § 404.1520(e).

[13] Id. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2.
> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.

Id. (internal citations omitted).

[16] Walker, 826 F.2d at 1002. Once the burden shifts to the Commissioner to show that the claimant can perform other work, the grids may come into play. Id.

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Walker v. Bowen, 826 F.2d 996,
(continued...)

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as the ALJ introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

## III. SUMMARY OF THE RECORD EVIDENCE

Plaintiff was thirty five (35) years old at the time of the ALJ's decision on April 18, 2007. (R. 68, 316.) He has a high school education, and has previous work experience as a welder. (R. 317-19.) Plaintiff contends that he has been unable to work since May 2, 2002 due to a bulging disc in his lumbar spine and asthma. (R. 23, 38, 68, 112-20.) Plaintiff is insured for benefits through December 31, 2009. (R. 75.)

Plaintiff has a history of lower back pain that is first documented in the medical evidence of record by treatment notes from Plaintiff's treating chiropractor, Chris W.

---

[17](...continued)
1003 (11th Cir. 1987) ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] *See* id.

[21] *See* Doughty v. Apfel, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

McKenney, D.C. Plaintiff saw Dr. McKenney eighteen times between January 2003 and April 2003 for treatment of left shoulder pain with numbness radiating down his arm, and pain and discomfort in his mid-thoracic and lumbar spine. Dr. McKenney's examination of Plaintiff revealed muscle spasms in the thoracic and lumbar spine, and mildly painful range of motion in the lumbar spine. Straight leg raise testing[22] was positive. An x-ray of Plaintiff's full spine was taken in Dr. McKenney's office and revealed mild degenerative changes in the thoracic and lumbar spine. Dr. McKenney diagnosed Plaintiff with degenerative disc disease of lumbar and thoracic spine and spinal pain.

Over the course of treatment, Dr. McKenney noted significant improvement in Plaintiff's symptoms related to his cervical and thoracic spine. However, because Plaintiff's lower back pain did not seem to be responding to treatment, Dr. McKenney sent Plaintiff for an MRI.[23] According to Dr. McKenney's notes, Plaintiff apparently sought additional treatment for his lower back pain with Dr. Kim who administered cortisone injections in April 2003. Plaintiff advised that Dr. Kim limited Plaintiff to lifting no more than 30 pounds. (R. 270-73.)

In March 2004, Plaintiff reported to Dr. Alfredo L Jacome for a neurological consultation pursuant to his complaints of progressively worsening lumbar pain that radiates into his legs. Dr. Jacome's examination of Plaintiff revealed tenderness to palpation of the sacral area, hypoactive reflexes, normal muscle strength, coordination,

---

[22] Straight leg raise testing is used to detect organic causes of low back pain. Craig Liebenson, *Vleeming's Active SLR Test as a Screen for Lumbopelvic Dysfunction*, DYNAMIC CHIROPRACTIC (Feb. 24, 2003).

[23] The results of this MRI are not included in the administrative record.

and sensation in all four extremities, and normal balance and gait. Straight leg raise testing was negative bilaterally. Dr. Jacome sent Plaintiff for an MRI of his spine and electrodiagnostic studies in an attempt to rule out lumbar bulging disc and chronic lumbar polyradiculopathy. (R. 173-74.)

In April 2004, Dr. Jacome reviewed the results of a nerve conduction study which revealed "no electrophysiological evidence of lumbar motor neuropathy or peripheral neuropathy" as well as the result of the MRI of Plaintiff's lumbar spine which revealed bilateral neural foraminal narrowing at L4-L5 due to a circumferential annular bulge and ligamentous and facet hypertrophy. (R. 166, 172.) Dr. Jacome diagnosed Plaintiff with lumbar bulging disc causing neural foraminal stenosis which he described as "a relatively mild and manageable neuromuscular condition that could benefit from P[hysical] T[herapy] and low dose of pharmacological treatments." He opined that, despite his back condition, Plaintiff had "good vocational potential. . . [and that] with the proper treatment and restrictions he could work as a police officer." (R. 165.)

In August 2004, Plaintiff initiated treatment with Dr. Jay Maldonado, his treating physician. Plaintiff saw Dr. Maldonado six times between August 2004 and May 2005. Dr. Maldonado's examination of Plaintiff during his initial visit revealed minimal discomfort upon deep palpation of the thoracic spine, full anterior lumbar flexion range of motion and straight leg raise testing was negative bilaterally. Further, Dr. Maldonado noted that Plaintiff was active and playing softball three times per week. (R. 183-87.) In October 2004, Plaintiff returned with complaints of chronic low back pain which radiated into his legs if he was seated for long periods of time. Examination of Plaintiff revealed a

stable unassisted gait, negative straight leg raise testing and a full range of motion in Plaintiff's hips. During the office visit, Plaintiff advised Dr. Maldonado that he works with his father training horses. (R. 181-82.) A month later, Plaintiff returned for a follow up visit and advised that although physical therapy was helping his symptoms, he continued to experience chronic lumbar pain radiating into his legs that gets worse with prolonged standing and sitting. Examination revealed a limited range of motion in the lumbar spine and impaired reflexes in Plaintiff's lower extremities bilaterally. Dr. Maldonado noted Plaintiff's unassisted gait was within normal limits. (R. 179-80.)

Between October 2004 and May 2005, Plaintiff reported to HealthSouth for physical therapy fifteen times. Over the course of treatment, Plaintiff reported a mild decrease in his pain level and he demonstrated progressively improved ability to perform the therapeutic activities. (R. 196-249.) On more than one occasion, Plaintiff's therapist noted that Plaintiff had a fair prognosis or good "potential for continued improvement." (R. 196, 208, 214, 219, 222.)

Having diagnosed Plaintiff with chronic mechanical low back pain with neurogenic claudication due to L4-L5 spinal stenosis, Dr. Maldonado referred Plaintiff to Dr. Antonio DiSclafani for a surgical consultation. (R. 193.) Dr. DiSclafani's examination of Plaintiff in November 2004 revealed painful range of motion in Plaintiff's lumbar spine radiating into his buttocks, normal strength in the lower extremeties, and negative straight leg raise testing. Dr. DiSclafani recommended Plaintiff undergo a laminectomy at L4-L5. (R. 256.) He opined that Plaintiff was "unlikely to get well" without surgery. (R. 255.)

8

Pre-operative x-rays of Plaintiff's spine, taken in December 2004, revealed mild disc space narrowing at L4-L5 and L5-S1 with moderate facet sclerosis and hypertrophy, and slightly narrowed annulus pulposus diameter of lumbar spinal canal at L4-L5 possibly indicating some element of lumbar spinal stenosis. (R. 258.) Dr. DiSclafani's pre-operative examination of Plaintiff revealed pain with bending, negative straight leg raise testing, and normal strength in the lower extremities. (R. 262-63.)

Following the laminectomy, Plaintiff reported improvement of his leg pain. Dr. DiSclafani advised him to gradually increase his activities. (R. 254.) During a follow up visit with Dr. DiSclafani in February 2005, Plaintiff advised his legs "still feel good" but his back continued to bother him. Dr. DiSclafani recommended lumbar spinal strengthening and opined that "[Plaintiff] will do very well." (R. 253.)

In March 2005, Plaintiff informed his treating physician, Dr. Maldonado, that although he continued to experience low back pain, surgery had resolved the pain in his lower extremities. Dr. Maldonado noted Plaintiff had a stable gait and was in no apparent distress. Otherwise, his examination of Plaintiff was unremarkable. (R. 177-78.) Plaintiff returned in May 2005 complaining of low back pain radiating into his legs bilaterally. The neurological examination was normal. Physical examination of Plaintiff revealed limited and painful range of motion in Plaintiff's lumbar spine and a slow unassisted gait. Dr. Maldonado noted that Plaintiff was able to sit still. (R. 175-76.)

Dr. Edward L. Demmi performed a consultative examination of Plaintiff in April 2005 pursuant to the Social Security Administration's request. Plaintiff advised Dr. Demmi that following surgery, he no longer had leg numbness, but his back pain had

9

gotten worse. Plaintiff complained that it was difficult for him to stand or walk for more than ten minutes at a time. He reported that physical therapy seemed to help his symptoms. Upon examination, Dr. Demmi noted a normal range of motion in the cervical spine; no swelling or deformity in upper or lower extremities; intact motor strength and sensation in the shoulders, elbows, forearms, wrists, hands, hips, and knees; intact grip strength bilaterally; normal capacity for fine manipulation; decreased range of motion but no muscle spasms in the thoracolumbar spine; and positive straight leg raise testing. Dr. Demmi also observed Plaintiff to have a normal unassisted gait. Dr. Demmi opined that Plaintiff had no motor deficits in his upper or lower extremities but decreased range of motion in the lumbar spine. He diagnosed Plaintiff with chronic low back pain with a radicular component. (R. 275-79.)

Two non-examining state agency physicians reviewed Plaintiff's file to assess his physical residual functional capacity. In May 2005, Dr. Harvey Faith opined that Plaintiff was capable of lifting and/or carrying twenty pounds occasionally and ten pounds frequently; standing and/or walking for about six hours in an eight hour workday; sitting (with normal breaks) for about six hours in an eight hour workday; and pushing / pulling without limitation. He further found Plaintiff to have no postural, manipulative, or environmental limitations. (R. 280-87.) The second non-examining state agency physician, Dr. Bancks, reviewed Plaintiff's file in August 2005 and opined that Plaintiff was capable of lifting and/or carrying twenty pounds occasionally and ten pounds frequently; standing and/or walking for about six hours in an eight hour workday; sitting (with normal breaks) for about six hours in an eight hour workday; and pushing / pulling

without limitation. However, unlike Dr. Faith, Dr. Bancks imposed postural limitations. He found Plaintiff capable of never climbing ladders, ropes and/or scaffolds; and only occasional balancing, stooping, and/or crouching. Dr. Bancks noted Dr. Jacome's opinion that Plaintiff retained the ability to work as a policeman, and that no worsening of symptoms had been alleged. (R. 288-95.)

Plaintiff subsequently supplemented the record with treatment notes from Dr. Claire Carlo, a treating physician. Plaintiff apparently saw Dr. Carlo four times between July 2005 and September 2006 for treatment of his low back pain. In July 2005, Dr. Carlo noted Plaintiff's complaint that despite surgery, he continues to have chronic low back pain that radiates into his left leg. She prescribed pain medication. (R. 304-06.) In October 2005, Plaintiff advised Dr. Carlo that his right leg occasionally feels "weak" when he has been walking the horses a lot. However, he reported that the prescribed pain medications provided "good pain relief" which enabled him to continue his work at the horse track. (R. 301-02.) In September 2006, Plaintiff returned for prescription refills. He advised that he gets relief of back pain from his pain medication but that he was still having trouble sleeping through the night. Dr. Carlo noted that Plaintiff was only taking one Relafen twice a day. She instructed him to take *two* Relafen at a time for improved pain relief. (R. 296-300.)

During the hearing on March 16, 2007, Plaintiff testified that he experiences disabling back pain that radiates into his legs. (R. 321-22.) According to Plaintiff, prolonged standing, sitting, or walking exacerbates his pain. (322-24.) Although his leg pain does not cause him to lose his balance, Plaintiff reported that it occasionally

11

causes "weakness" in his legs. (R. 329.) Plaintiff testified that he was able to sit for fifteen to twenty minutes before he needed to get up and move around (R. 323), he can stand for approximately twenty minutes at a time (R. 323-24), and he can walk for ten minutes before he starts feeling pain. (R. 324.)

With regard to specific activities of daily living, Plaintiff testified that pain makes it difficult for him to grocery shop and that it interferes with his sleep (because he cannot find a comfortable position). (R. 323.) According to his testimony, Plaintiff is able to care for his personal hygiene. (R. 325.) He also helps get his children ready for school and assists them with their homework. (R. 325, 328.) He cooks dinner, can drive an automobile, and occasionally does the laundry. (R. 325-26.) In addition, Plaintiff testified that he took his son fishing all day the weekend before the hearing. (R. 328.)

In the ALJ's review of the record, including Plaintiff's testimony, and medical records from several health care providers, the ALJ determined that Plaintiff suffers from back pain, and asthma. (R. 23.) While these impairments are severe, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations. Specifically, the ALJ found that the objective medical evidence fails to establish that Plaintiff met the criteria of Sections 1.02, 1.04 and 3.03 of the Listings of Impairments. (R. 23-24.)

The ALJ then found that Plaintiff retained the RFC to perform the exertional demands of the full range of sedentary work. (R. 24.) The ALJ limited Plaintiff to lifting and carrying fifteen to twenty pounds; standing / walking for two to three hours in an

12

eight hour work day; and sitting six to eight hours in an eight hour work day. After finding that Plaintiff could not perform his past relevant work as a welder, the ALJ applied Rule 201.28 of the Medical-Vocational Guidelines (the "grids")[24] which directed a finding that Plaintiff was "not disabled." (R. 26-27.)

## IV. DISCUSSION

Plaintiff raises two issues in his appeal. First, Plaintiff argues that the ALJ improperly disregarded Plaintiff's pain testimony in violation of the Eleventh Circuit pain standard. Secondly, Plaintiff contends that the ALJ erred by failing to obtain vocational expert testimony at step five of the sequential analysis to address Plaintiff's pain as a severe nonexertional impairment.

### A.     The ALJ Did Not Err in Partially Discrediting Plaintiff's Pain Testimony.

Plaintiff's first argument challenges the ALJ's assessment of the credibility of his subjective complaints and testimony. "[C]redibility determinations are the province of the ALJ."[25] In evaluating a disability, the ALJ must consider all of a claimant's impairments, including his subjective symptoms such as pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.[26] Where, as here, an ALJ decides not to fully credit a claimant's testimony about subjective complaints concerning the intensity, persistence, and limiting effects of symptoms, the ALJ must articulate specific and adequate reasons for doing so, or the

---

[24] 20 C.F.R. § 404, subpt. P, app. 2.

[25] Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005).

[26] 20 C.F.R. § 404.1528.

13

record must be obvious as to the credibility finding.[27] A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.[28]

In the instant case, the ALJ applied the Eleventh Circuit's pain standard "threshold" assessment[29] to Plaintiff's subjective complaints by noting Plaintiff's history of neuromuscular symptoms and lumbar pain with radiculopathy and concluding that Plaintiff had medically determinable impairments that could reasonably be expected to produce the alleged symptoms. (R. 25.) After considering Plaintiff's alleged symptoms "and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929, and SSRs 96-4p and 96-7p," the ALJ concluded that "[Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms [we]re not entirely credible." (R. 25.)

The ALJ did not reject Plaintiff's Complaints of severe back pain, as suggested by Plaintiff, but rather explicitly recognized that "[t]he evidence shows that the claimant has a history of neuromuscular symptoms and lumbar pain with radiculopathy. . . [and] [t]he claimant continued to experience symptoms of lumbar stenosis." (R. 25.) Thus, while the ALJ did not fully credit Plaintiff's subjective complaints of pain, the ALJ still gave Plaintiff's testimony significant weight. Indeed, in assessing Plaintiff's residual

---

[27] Foote v. Chater, 67 F.3d 1553, 1561-62 (11th Cir. 1995); Jones v. Dep't of Health & Hum. Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence); Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988).

[28] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

[29] Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992).

14

functional capacity, the ALJ chose to give greater weight to Plaintiff's complaints of continued occasional radicular symptoms involving his legs than to the opinions of the non-examining state agency physicians because he found Plaintiff's functional capacity to be more limited than that described by the state agency physicians.

An individual's residual functional capacity ("RFC") is "the most [he / she] can still do despite [his / her] limitations."[30] "'[S]edentary work' represents a significantly restricted range of work. Individuals who are limited to no more than sedentary work by their medical impairments have very serious functional limitations."[31] Thus, by finding that Plaintiff retained the residual functional capacity to perform sedentary work, the ALJ discredited Plaintiff's testimony only to the extent that Plaintiff alleged his pain was totally incapacitating.

In support of his decision not to fully credit Plaintiff's testimony, the ALJ favorably relied upon medical evidence from Plaintiff's treating physicians that suggested that Plaintiff's pain was not as debilitating as alleged. For example, Plaintiff's treating physician, Dr. Carlo, noted that Plaintiff's pain medications were reportedly providing Plaintiff with "good pain relief." (R. 301-02.) Another treating physician, Dr. Jacome, opined that Plaintiff had "good vocational potential" and that Plaintiff would benefit from physical therapy and low dose pharmacological treatment characterizing Plaintiff's condition as "mild and manageable." (R. 165.) According to Dr. Jacome, with proper medical treatment and subject to some activity restrictions, Plaintiff was capable of

---

[30] 20 C.F.R. § 404.1545(a)(1).

[31] SSR 96-9p.

working as a police officer. (R. 165.) Plaintiff did participate in physical therapy between October 2004 and May 2005 and reported that therapy was helpful in improving his symptoms. (R. 196-249.) Further, Plaintiff's therapist noted that Plaintiff had a fair prognosis or good "potential for continued improvement." (R. 196, 208, 214, 219, 222.)

The ALJ further found that Plaintiff's reported activities of daily living were inconsistent with those of a person totally incapacitated by pain. For example, Plaintiff testified that he was able to drive, prepare meals, help his children get ready for school, help his children with their homework, and do laundry. (R.324-26.) Plaintiff also testified that, a week prior to the hearing, he had spent an entire day fishing with his son. In addition, a treatment note from Dr. Carlo notes that Plaintiff had been "walking a lot of horses" and working at the horse track. (R. 301-02.) According to the ALJ, such activities "suggest that [Plaintiff] could easily sustain sedentary exertion on a regular and continuous basis." (R. 26.)

Accordingly, the Court concludes that the ALJ did not err in his analysis and evaluation of the functional limitations caused by Plaintiff's pain. The ALJ articulated specific reasons for not accepting Plaintiff's complaints that his pain rendered him incapable of performing any work activity, even at the limiting sedentary level.

**B.     The ALJ Properly Relied on the Grids.**

Plaintiff next argues that the ALJ erred in relying on the grids and should have obtained vocational expert testimony. In opposition, the Commissioner argues that the Commissioner fulfilled his burden at step five of the sequential analysis by properly

employing Rule 201.28 of the grids because Plaintiff did not show he was unable to perform a full range of sedentary work.

In order to meet the qualifications for sedentary work—the RFC the ALJ concluded could be performed by Plaintiff—an individual must be able to lift up to ten pounds at a time, occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.[32]

At step five of the sequential analysis, the burden of proof shifted to the Commissioner to establish that the claimant could perform other work that exists in the national economy.[33] In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.[34] This burden may sometimes be met through exclusive reliance on the grids when each variable on the appropriate grid accurately describes the claimant's situation.[35] Exclusive reliance on the grids is appropriate when the claimant is able to perform a full range of work at a given functional level or when a claimant has nonexertional impairments that do not significantly limit basic work skills.[36]

---

[32] SSR 96-9p.

[33] Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).

[34] *See* Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).

[35] *See* Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987).

[36] Specifically, the Eleventh Circuit has held that "non-exertional limitations can cause the grid to be inapplicable only when the limitations are severe enough to prevent a wide range of gainful employment at a designated level." Murray v. Heckler, 737 F.2d 934, 935 (11th Cir. 1984).

Here, the ALJ relied exclusively on the grids because the ALJ concluded that Plaintiff had the exertional capacity to perform the full range of sedentary work. (R. 25-26.) Applying Title 20, Part 404, Subpart P, Appendix 2, Rule 201.28 of the Code of Federal Regulations, the ALJ found that Plaintiff's profile as a younger individual able to perform a full range of sedentary work directed the ALJ to a finding of "not disabled."[37]

In his brief, Plaintiff does not point to any specific non-exertional limitations caused by his pain nor does he identify any activities required by sedentary work that he is unable to perform as a result of his pain.[38] And to the extent Plaintiff challenges the ALJ's determination of his RFC, as fully discussed above, there is substantial evidence in the record to support the ALJ's conclusion that, notwithstanding Plaintiff's medically determinable impairments, Plaintiff retains the residual functional capacity to perform the exertional demands of the full range of sedentary work. Accordingly, the Court concludes that the ALJ did not err in applying the grids, instead of using a VE, because Plaintiff's impairments did not erode the work base for sedentary work.

---

[37] "Age: Younger individual age 18-44; Education: High school graduate or more; Previous Work Experience: Skilled or semi-skilled—skills not transferable; Decision: Do." 20 C.F.R. § 404, subpt. P, app. 2, T.1.

[38] Basic work activities are "the abilities and aptitudes necessary to do most jobs" and include: (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b).

## V. CONCLUSION

In view of the foregoing, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter final judgment in favor of the Commissioner consistent with this Order and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on September 14, 2009.

*[signature]*
GARY R. JONES
United States Magistrate Judge

Copies to:
    All Counsel